STATE of North Dakota, Plaintiff and Appellee,

v.

Daniel PLANZ, Defendant and Appellant.

STATE of North Dakota, Plaintiff and Appellee,

v.

Rodney E. BAKER, Defendant and Appellant.

Cr. Nos. 743, 744.

Supreme Court of North Dakota.

April 3, 1981.

Charles J. Gilje, State's Atty., Jamestown, for plaintiff and appellee State of North Dakota.

Terence J. Paulson, of Hjellum, Weiss, Nerison, Jukkala & Wright, Jamestown, for defendants and appellants.

VANDE WALLE, Justice.

Daniel Planz and Rodney E. Baker appeal from separate judgments of conviction in the district court of Stutsman County. The appeals were consolidated for presentation to this court. The defendants were convicted of possession of marijuana under N.D. C.C. Section 19–03.1–23(3) and in this appeal assert that certain evidence used in their convictions was obtained by the police illegally. We affirm.

Late in the afternoon of May 29, 1980, Gary Odegaard, an off-duty North Dakota highway patrolman, was leaving the Tastee-Freez in Jamestown. While walking across the Tastee-Freez parking lot toward his car he observed the defendants in the front seat of a grey station wagon bearing Minnesota license plates. Odegaard noticed that the defendants were hunched over in the front seat; that after he entered his car the person occupying the driver's seat in the station wagon turned and waved to him; that the driver appeared to be under the influence of "something"; and that the driver appeared "rather strange." Odegaard wrote down the license number of the station wagon and drove to his home where he called the Jamestown police department to report his observations.

After receiving Odegaard's call, Police Dispatcher Roger Mayhew called Sergeant Jerry Klosterman, who was home for his evening meal, and told him of Odegaard's observations and instructed him to investigate. Klosterman drove to the Tastee-Freez and entered the parking lot. He spotted the grey station wagon in the nearly empty parking lot at a point approximately 20 to 30 feet north of the building, facing southwest. As Klosterman pulled into the parking lot he observed a person exit from the passenger side of the station wagon and walk into the west entrance of the Tastee-Freez. Klosterman parked his patrol car behind and approximately 50 feet away from the station wagon.

After Klosterman parked his patrol car he got out and started walking toward the station wagon, which was positioned at a point directly between Klosterman's patrol car and the west entrance of the Tastee-Freez. Klosterman later testified at a suppression hearing that his intent upon heading toward the station wagon was to see if anyone was inside because the report which he had received was that two persons were in the car and he had seen one person leave it. As Klosterman walked by the passenger side of the station wagon to see if there was another person inside he observed through the open window a marijuana pipe and a small plastic bag containing marijuana lying on the front seat. After seeing these items, Klosterman moved closer to the car and bent down for a closer look. He admitted that a portion of his face may have broken the plane of the window. Upon this

closer inspection, Klosterman "smelled the odor of used marijuana."

After making his observation in the station wagon, Klosterman called for a backup policeman and entered the Tastee-Freez where he waited for the defendants to come out of the restroom. After they emerged from the restroom Klosterman asked the defendants if he could talk with them in the parking lot. They agreed and all three stepped outside the west entrance. The defendants were asked which one of them owned the station wagon and Planz admitted ownership. Klosterman then asked the defendants to accompany him to the station wagon, where he pointed to the pipe and the plastic bag on the front seat. He then placed the defendants under arrest. In the meantime, Officer Finck had arrived at the scene and after their arrest the defendants were searched and placed in Finck's patrol car, whereupon they were read their rights.

After placing the defendants in the patrol car, Klosterman returned to and entered the station wagon in order to remove the pipe and the small plastic bag. While inside the vehicle he noticed, in the back seat, two large plastic garbage bags which were partially covered by a coat or blanket or something similar. Sticking out of the exposed portion of one of the garbage bags was a marijuana leaf. Klosterman removed the small plastic bag, the pipe, and the two large plastic bags. The following day a search warrant was obtained for the station wagon and various articles not at issue here were seized.

A hearing on the defendants' motion to suppress evidence was held on July 17, 1980, in the district court of Stutsman County. Following the hearing, that motion was denied. On July 23, 1980, following a trial to the court, the defendants were convicted of possession of a controlled substance and subsequently were sentenced to one year at the North Dakota State Penitentiary. This appeal arises from those convictions.

The primary issue raised by the defendants in this appeal is whether or not the evidence obtained by the police from the defendants' car was obtained in violation of the defendants' Fourth Amendment rights and therefore was inadmissible at their trial.

 The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Section 8 of the North Dakota Constitution is essentially the same. The constitutional rights guaranteed by the Fourth Amendment may be enforced by excluding from trial the evidence searched for and seized in violation of that Amendment. This exclusionary rule was first announced by the United States Supreme Court in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). In *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the application of this exclusionary rule was extended to the State courts. The rationale supporting the rule is that it will serve as a safeguard for personal privacy and dignity by preventing unwarranted intrusions by the State. *State v. Phelps*, 297 N.W.2d 769 (N.D.1980).

 It is clear from the language of the Fourth Amendment that before the protection afforded therein may be asserted by the accused two conditions must be present: first, a search, or a seizure, or the two in combination, must have been directed against the accused by the State; and the search and seizure must have been of a nature contemplated by the Fourth Amendment. That Amendment expressly identifies the nature of the search and seizure which it is designed to protect against as "unreasonable." This court has adopted the position that what is or is not a reasonable search cannot be defined in definite terms and each case must be decided on its own facts. *State v. Gagnon*, 207 N.W.2d 260 (N.D.1973).

We believe that before determination of the issue regarding reasonableness can be made in any case where a defendant seeks the protection of the Fourth Amendment, at least one, and possibly two, threshold questions must be considered. The first question is: Did the police conduct complained of constitute a search and seizure directed against the accused? If the answer to that question is in the negative, no further discussion of Fourth Amendment protection is required. On the other hand, if the answer to that question is in the affirmative, the next, and most critical, question must be asked and answered. That question is: Were the search and seizure of a nature which trigger Fourth Amendment protection? Again, if the answer is in the negative, consideration of the protection found in the Fourth Amendment is not necessary. However, if the answer to the question is in the affirmative, a full examination of the Fourth Amendment issue may be required.

■ In considering these two questions, we begin with an examination of the term "seizure." We believe that term carries with it the same general meaning whether it is used in the everyday sense of the word or used within the context of the Fourth Amendment. Indeed, the word "seizures," as used in the Fourth Amendment, generally has not been the source of confusion. 1 LaFave, *Search and Seizure*, § 2.1(a) at 221 (1978). The "act of physically taking and removing tangible property is generally a 'seizure,' . . ." 68 Am.Jur.2d, *Searches and Seizures*, § 8 (1973).[1] There is no dispute in the present case that the removal by Klosterman of the small and the large plastic bags and the marijuana pipe from the defendants' car constituted a seizure in the general sense and a seizure within the meaning of that term as used in the Fourth Amendment. However, in the context of a criminal case such as the one now before this court, the constitutional significance of a seizure turns upon the

nature of the events which led to the seizure (i. e., the search), and the ultimate role of the item or items seized in regard to the conviction of the defendant.

■ Unlike the term "seizure," the term "search," within the meaning of the Fourth Amendment, is not so clearly reduced to a verbal equation. Webster's Third New International Dictionary, Unabridged, 1971, defines "search" as: "1: to look into or over carefully or thoroughly in an effort to find or discover: . . ." However, it would be absurd to attach constitutional restrictions to that type of conduct as carried out by police officers. The type of search defined above is precisely the kind of vigilance we expect of every law-enforcement officer who, in an effort to keep a community safe from crime, goes out on routine patrol. If that type of conduct, coupled with a subsequent seizure of an item discovered in the course of such conduct, is all that is required to activate the protection of the Fourth Amendment, then surely the present appeal could be quickly disposed of. However, a Fourth Amendment "search," as the term has been developed by the courts, is defined in terms of the focus of the search rather than by what conduct constitutes a search. This point was made by the Supreme Court when it declared that a Fourth Amendment search does not occur unless the police have intruded into "a constitutionally protected area." *Silverman v. United States*, 365 U.S. 505, 512, 81 S.Ct. 679, 683, 5 L.Ed.2d 734, 739 (1961). Those constitutionally protected areas referred to by the Court in *Silverman* are enumerated in the Fourth Amendment as "persons, houses, papers and effects, . . ." In *Preston v. United States*, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964), the Supreme Court concluded that the term "effects," as found in the Fourth Amendment, included automobiles.

---

**1.** Because this appeal involves evidence which is tangible we do not discuss whether or not intangibles may be said to be seizable. Compare *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), with *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928).

In 1967 the Supreme Court shifted the focus of the determination of whether or not a search was such within the Fourth Amendment from particular areas to something more general. In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), in response to the petitioner's claim that a phone booth is a "constitutionally protected area," Justice Stewart, writing for the Court, stated:

"But this effort to decide whether or not a given 'area,' viewed in the abstract, is 'constitutionally protected' deflects attention from the problem presented by this case. For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citations omitted.] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. [Citations omitted.]" 389 U.S. at 351, 88 S.Ct. at 511, 19 L.Ed.2d at 582.

Justice Harlan, in his concurring opinion, indicated what he took this new standard to mean. 389 U.S. at 360, 88 S.Ct. at 516, 19 L.Ed.2d at 587. Quoting from Justice Harlan's concurring opinion in *Katz, supra*, the Supreme Court subsequently labeled the new standard as the "reasonable 'expectation of privacy'" test. *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889, 899 (1968). This court adopted the "reasonable expectation of privacy" test in *State v. Matthews*, 216 N.W.2d 90 (N.D. 1974).

Although this court has implemented the "reasonable expectation of privacy" test, we have not altogether abandoned consideration of the pre-*Katz* "area" test. In *State v. Fischer*, 270 N.W.2d 345, 352 (N.D.1978), we stated:

"This new doctrine, however, does not completely abolish the importance of the constitutionally protected area doctrine because the area of the search is still an important factor in determining whether or not the person searched had a reasonable expectation of privacy."

This point was made in *Fischer, supra*, but its practical application was recognized earlier in *State v. Stockert*, 245 N.W.2d 266, 269 (N.D.1976), where we acknowledged "that searches of vehicles may be made under circumstances where searches of buildings would not be allowed because of the ambulatory character of automobiles, the lesser expectation of privacy as to automobiles, and the fact that automobiles are often within the plain view of officers."

 In light of the above discussion we believe that a "search," as the term is used in the Fourth Amendment, is the same thing as a "search" in the general sense with the additional aspect that a Fourth Amendment search is specifically directed by the police toward an area in which the accused holds a reasonable expectation of privacy. *State v. Johnson*, 301 N.W.2d 625 (N.D.1981). Such a search is unreasonable per se, and therefore violative of the Fourth Amendment unless it is conducted pursuant to a valid search warrant or pursuant to one of the generally recognized exceptions to the warrant requirement. *Katz, supra; State v. Gagnon, supra; State v. Johnson, supra*. This court has discussed the four general exceptions to the warrant requirement: (1) a search incident to a lawful arrest [*Gagnon, supra*, 207 N.W.2d at 263]; (2) a border search [*Gagnon, supra*, 207 N.W.2d at 264–265]; (3) a valid consent to search given by an appropriate person [*State v. Swenningson*, 297 N.W.2d 405 (N.D.1980)]; or (4) the evidence seized is in "plain view" of officers legally in a position to see it [*State v. Goeller*, 264 N.W.2d 472 (N.D.1978)].

 It is arguable that even though the pre-*Katz* "area" test was deemed by the Supreme Court to focus on an inappropriate issue, that test did not give rise to great complexity in its application to search-and-seizure cases. The post-*Katz* "reasonable expectation of privacy" test does not allow for a simple resolution of Fourth Amendment issues by a declaration that a particular item or area is or is not to be afforded that Amendment's protection. Indeed, much intellectual tightrope-walking may be

required in applying the latter test. See 1 LaFave, *supra*, § 2.1. But, however difficult it may be in some cases to determine whether or not an accused holds a reasonable expectation of privacy as to a given item in a particular area, we find no such difficulty in this case. We cannot conclude that defendants who leave contraband on the front seat of an unattended car, with the windows rolled down, parked in a public parking lot for the whole world to view without entering the car, may find refuge behind the Fourth Amendment.[2] Those facts simply will not support the defendants' claim that such contraband reposed in an area in which they reasonably expected that it would be accorded the sanctity associated with the privacy the Fourth Amendment seeks to protect. Because of our inability to conclude that the contraband on the front seat of defendant Planz's car was protected by a reasonable expectation of privacy, we must necessarily conclude that it was not discovered pursuant to a "search" within the meaning of the Fourth Amendment.

Although we have concluded that the contraband on the front seat of Planz's car was not discovered through a Fourth Amendment search, our examination of the issue raised in this appeal has not ended. We must now move to the question of whether or not the seizure of that contraband was in violation of the Fourth Amendment.

■ At the onset of our discussion regarding the seizure by Klosterman of the front-seat contraband we point out a dis-

tinction between this case and the typical "plain view" doctrine case. The United States Supreme Court case most often referred to in discussions regarding the "plain view" doctrine is *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In that case, Justice Stewart's plurality opinion characterized the "plain view" doctrine as being inapplicable until there has been a valid "intrusion" into a constitutionally protected area. In discussing the doctrine Justice Stewart stated:

"What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused." 403 U.S. at 466, 91 S.Ct. at 2038, 29 L.Ed.2d at 583.

In specifically identifying these prior justified intrusions Justice Stewart pointed to three types: (1) where the officer is present pursuant to a valid search warrant; (2) where the intrusion is supported by one of the recognized exceptions to the warrant requirement; and (3) "Finally, the 'plain view' doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object." 403 U.S. at 466, 91 S.Ct. at 2038, 29 L.Ed.2d at 583. We believe that the distinction between the *Coolidge* "plain view" observations, with their threshold "intrusion" requirement, and Klosterman's observation is crucial. The temptation is great to characterize Klosterman's observation as "plain view." However, for the purposes of this case we avoid doing so.[3] Klosterman

2. We are not persuaded by the defendants' argument that the only reason Klosterman was present in the parking lot was for the express intention of investigating suspicious persons, namely, the defendants. Whether or not the circumstances which brought Klosterman to the parking lot were law-enforcement in nature, the fact remains that he, just as any citizen, had a right to be in the parking lot under any lawful circumstances.

3. See *Scales v. State*, 13 Md.App. 474, 478, 284 A.2d 45, 47 (1971), where, at footnote 1, the court stated:

"In this context, we studiously avoid the phraseology 'in plain view' to avoid any im-

plication that the so-called 'plain view doctrine' is being invoked. That doctrine is not here applicable. Needless confusion is frequently engendered by the employment in many opinions of the same phrase—'in plain view'—to describe two visually similar but legally distinct situations. The 'plain view doctrine,' as described in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, refers exclusively to the legal justification—the reasonableness—for the seizure of evidence which has not been particularly described in a warrant and which is inadvertently spotted in the course of a constitutional search already in progress or in

made his observation without the aid of a *Coolidge*-type intrusion and the requirements of the "plain view" doctrine therefore do not apply to the present discussion.

Three of the *Coolidge* requirements address the issue of whether or not the observation at issue was actually a "plain view" observation.[4] Because we have concluded that Klosterman did not make his observation subsequent to an intrusion, valid or otherwise, into a constitutionally protected area, the two remaining *Coolidge* requirements regarding observation need not be considered.[5]

■ The other limitation on the *Coolidge* "plain view" doctrine is addressed to the seizure of the object observed. The plurality in *Coolidge* pointed out that plain view alone never is enough to justify a warrantless seizure absent exigent circumstances.[6] Again, this limitation need not be discussed in the context of the present issue. Along with being a limitation to a doctrine not here applicable, the exigent-circumstances requirement may be more generally thought of as a check on the police which is designed to prevent, after an intrusion into a constitutionally protected area, the wholesale seizure of items which a

police officer might subjectively believe have some relation to some crime. This clearly was not the case with Klosterman in the Tastee-Freez parking lot. The seizure made by Klosterman concerned the very item which had given him the requisite probable cause to arrest the defendants. In this regard, we view as enlightening *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

■ It should be pointed out that *Ker* was decided eight years prior to *Coolidge, supra*. However, the seizure of evidence in *Ker* has been cited with approval recently by the Supreme Court.[7] We point out that while *Ker* is considered a "plain view" doctrine case, it appears to contain within it an exception to the exigent-circumstances requirement regarding the seizure of the evidence observed. We believe that the rationale of that exception extends beyond the "plain view" doctrine to any situation where a police officer inadvertently observes evidence and where that observation establishes probable cause to arrest the accused. In *Ker*, police officers had made observations of the defendant, a known marijuana dealer, while he was interacting with another drug dealer. The officers con-

the course of an otherwise justifiable intrusion into a constitutionally protected area. It has no applicability when the vantage point from which the 'plain view' is made is not within a constitutionally protected area. It is, therefore, literally discreet to use for such latter situations some alternative phraseology such as 'clearly visible,' 'readily observable,' 'open to public gaze,' etc., rather than to employ the words 'in plain view' in their purely descriptive capacity, lest the unwary reader read them in their other and talismanic capacity as an invocation of the doctrine of the same name in nonintrusive situations where it is not applicable. A 'plain view,' under its first connotation, is no intrusion at all and needs no justification; a 'plain view,' under its second connotation, is a justifiable intrusion, with the 'plain view doctrine' articulating the rationale of the justification."

4. The *Coolidge* plurality identifies these three as: (1) there must be a prior valid intrusion; (2) the observation of the evidence must be inadvertent; and (3) it must be immediately apparent to the police that they have evidence

before them. 403 U.S. at 466, 91 S.Ct. at 2038, 29 L.Ed.2d at 583.

5. It is clear from the record that Klosterman's observation was inadvertent and that he was immediately aware that he was looking at contraband. However, it is equally clear that the question of whether or not the *Coolidge* "plain view" doctrine applies turns on the initial intrusion into a constitutionally protected area.

6. Although we do not here rely on the automobile exception to the warrant requirement, we note some similarity between the issue before us and the one presented to the court in *People v. Davis*, 93 Ill.App.3d 217, 48 Ill.Dec. 675, 416 N.E.2d 1197 (1981).

7. See *LO–JI Sales, Inc. v. State of New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979), wherein at footnote 5 the Court stated:
 "Of course, contraband may be seized without a warrant under the plain view doctrine. See, e. g., *Ker v. California*, 374, U.S. 23, 42–43, 83 S.Ct. 1623, 1634–1635, 10 L.Ed.2d 726 (1963) . . . ."

cluded that the defendant was in possession of marijuana and went to his residence to arrest him. Once inside the defendant's apartment the officers arrested him and his wife and seized a brick of marijuana which was in plain view. Regarding the seizure, and with no reference to the existence of exigent circumstances, the Court said: "The evidence here, unlike that in *Harris*, was the instrumentality of the very crime for which petitioners were arrested, . . ." 374 U.S. at 42, 83 S.Ct. at 1634, 10 L.Ed.2d at 743.[8] It is precisely for this reason that Klosterman's seizure of the front-seat contraband was reasonable. He had probable cause to arrest the defendants. Indeed, the defendants here do not challenge their arrests. To conclude that Klosterman had probable cause to arrest (i. e., seize) the defendants but could not seize the very item which provided him with that probable cause would defy reason. This is particularly true where, as here, that evidence is displayed in a way which does not afford it a reasonable expectation of privacy.

A case relied upon by the defendants as reason for determining Klosterman's seizure of the front-seat contraband to be illegal is *State v. Parker*, 355 So.2d 900 (La.1978). Admittedly, *Parker* does lend some plausibility to the defendants' position. However, for reasons expressed below, we are not swayed to adopt the reasoning or result of that case. In *Parker*, an unattended, unlocked van, parked for several hours in an area plagued by burglaries, was observed by the police. An officer approached the vehicle, shined his flashlight inside, and observed a bag of marijuana protruding from under the front seat. Unlike the seizure in the present case, the seizure in that case occurred immediately, and thereafter a police stakeout resulted in the arrest of the defendant when he re-

turned to the van. Without acknowledging that the marijuana seized by the police was the very item which supplied probable cause to arrest the defendant, the court in *Parker* concluded that the marijuana was seized in violation of the Fourth Amendment. In reaching this conclusion the court relied heavily upon the plurality opinion of *Coolidge v. New Hampshire, supra*. In addition, while on one hand it determined that the observation by the police officer was not a "search" within the context of the Fourth Amendment, the court proceeded to apply the "exigent circumstances" test which serves as a corollary to the "plain view" doctrine. Our difficulty with this process is that while professing to rely on *Coolidge*, the Louisiana court did not appear to take into account the fact that the *Coolidge* plurality considered the "plain view" doctrine and its corresponding "exigent circumstances" test to be inapplicable unless a Fourth Amendment search had begun. Finally, as reasons for declining to adopt *Parker*, we note that the court was sharply divided as to the determination of that case and we reemphasize the majority's reliance on *Coolidge v. New Hampshire, supra*, a Supreme Court decision which serves as law only in regard to that particular case.

In light of the foregoing discussion, we see no logical reason why the defendants, who do not claim that *they* were illegally arrested (i. e., seized), should stand before this court and claim that the item which gave the police probable cause to arrest them may not also be seized.

 Because Klosterman was legally in a position to seize the front-seat contraband, and because we believe that his observation of the two large plastic garbage bags was not within the context of a Fourth Amendment search, we see nothing which would prohibit his seizure of those items.

---

**8.** The reference to "*Harris*" in the quotation is to *Harris v. United States*, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1349 (1947). *Harris* involved a search and seizure which was found reasonable under the search-incident-to-arrest exception to the warrant requirement. In *Ker*,

the Court expressly ruled that the observation and seizure of the brick of marijuana need not be considered under that exception because "the officer merely saw what was placed before him in full view." 374 U.S. at 43, 83 S.Ct. at 1635, 10 L.Ed.2d at 744.

■ For the reasons we have stated, the judgments of conviction [9] are affirmed.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.

---

**9.** Although the appeal is from the judgments of conviction, the transcript of the testimony adduced at the trial was not made a part of the record before this court. The defendants' position is that it is the denial of the motion to suppress with which they are concerned. Because of our disposition of this appeal we did not request a copy of the transcript of the trial. However, we point out that even though we were to agree with a defendant's contention that a motion to suppress should have been granted it would not automatically entitle him to a reversal of the judgment of conviction. See *City of Wahpeton v. Skoog*, 295 N.W.2d 313 (N.D.1980). If counsel for an appellant does not believe a complete transcript of the trial is necessary he should nevertheless follow the procedure in Rule 10(b), N.D.R.App.P., rather than unilaterally determining not to file the transcript.