STATE of North Dakota, Plaintiff
and Appellant,

v.

Keith KLEVGAARD, Defendant
and Appellee.

Crim. No. 760.

Supreme Court of North Dakota.

May 12, 1981.

Robert G. Hoy, Asst. State's Atty., Fargo, for plaintiff and appellant.

Garaas Law Firm, Fargo, for defendant and appellee; argued by David Garaas.

SAND, Justice.

A complaint charging Keith Klevgaard [Klevgaard] with burglary was filed in district court. Klevgaard moved to suppress certain evidence. After a hearing, the court issued an order [1] suppressing physical evidence seized from and statements or confessions made by Klevgaard, the defendant. The State of North Dakota appealed.

On 11 June 1980 at approximately 2:40 a.m., deputy sheriff Budd Warren [Warren] of the Cass County sheriff's department was routinely patrolling the community of Hunter, North Dakota, when he observed a lone automobile with Minnesota license plates parked on Main Street in front of the Bronze Hut Cafe. Two males, Klevgaard and Mike,[2] were at the rear of the automobile. Warren parked his squad car and approached the individuals. He innocuously inquired, "What's the problem?" and was confronted by Klevgaard who responded in a profane and obtrusive manner. Warren observed that Klevgaard had blood on his arm and shirt from a cut on his wrist. Warren also detected the odor of alcoholic beverages on Klevgaard's breath.

Mike then came from the rear of the car and told Warren that they were having trouble with their brake lights and blinkers. During this conversation Warren noticed a cardboard box under the rear of their automobile. However, the record reflects that at this time he was not able to observe the contents of the cardboard box.[3] Warren

---

1. See § 29–28–07(5), NDCC.

2. Because this individual was a juvenile at the time, we will use the pseudonym Mike in referring to him in this opinion.

3. The district court, relying solely upon the testimony of Warren, specifically found that

Warren did not know the box contained candy until after the car became stuck and the arrest was made. The defendant's attorney, in cross-examination of Warren, used selective parts of Warren's police report, but the part relating to the time Warren saw that the box contained

then told them to fix their tail lights and be on their way.

Warren got in his squad car, drove past the parked car and noticed Klevgaard and Mike return to the rear of the car, presumably to work on the tail lights. After Warren had driven past the parked car, Klevgaard and Mike picked up the box underneath the car, put it in the car and drove out of town in a northerly direction. The tail lights on their car were working at this time.

Warren radioed for assistance because he suspected a "possible burglary" and turned around to follow the car. As he drove by the Bronze Hut Cafe he noticed three candy bars on the "curve"[4] next to where the car had been parked. Warren followed the car for approximately ten miles without using red lights or a siren. In order to keep a constant distance between his squad car and the car he was following Warren had to vary his speed, and, at times, he had to go between 70 and 100 miles per hour.[5] The car ultimately became stuck and Klevgaard and Mike got out of the car. Warren had reason to believe the situation was dangerous because of the defendant's obnoxious behavior at the earlier encounter.

Warren instructed them to lie down in the middle of the road. Mike complied with this instruction, but Klevgaard continued to walk toward Warren and it took several repeated instructions until Klevgaard finally laid down on the road. In the meantime the backup assistance requested by Warren arrived, and Klevgaard and Mike were arrested and put in separate squad cars. Klevgaard was not informed of the cause of his arrest at this time, nor was the arrest pursuant to a warrant. However, Warren read the *Miranda*[6] rights to Klevgaard and Mike at the time of the arrest. Klevgaard responded that he understood the rights read to him.

Warren then went to the car, which was still running, and looked inside it. The passenger door was left open. From outside the car, Warren observed a box of candy bars, hamburger patties, and some hamburger or hot dog buns. Warren then seized these items without a warrant. After the search was finished, the officers and the two men then returned to Hunter. Klevgaard rode with Warren and Mike rode with the other officer. When Warren stopped in front of the Bronze Hut Cafe, he asked Klevgaard which door they broke into and Klevgaard replied "the back door." According to Warren, this is the only question he asked of Klevgaard during the ride from the place where the arrest was made

---

candy bars as he drove by the car at the first encounter was not mentioned, nor was the police report introduced into evidence. However, the State included the police report as part of the appendix. The defendant objected to its inclusion because it was not part of the record or evidence that was introduced. We did not take into consideration the police report in resolving the issues in this case. The State should have introduced the police report at the hearing or sought an appropriate order to remand the case for such purposes if the State wanted to use the report on appeal.

4. The district court specifically found that the three candy bars were on the "curve." This finding resulted from the court relying upon the transcript of the Warren testimony at the preliminary hearing. The transcript erroneously used the word "curve" instead of the word "curb" in two instances. This mistake was corrected by the court reporter, but not until after the order suppressing the evidence was issued. The State made a motion to correct the transcript, but because the time for appeal was

expiring the appeal was filed and the court lost its jurisdiction. See n. 7.

5. The district court issued an amended finding of fact relating to the speed of the automobile followed by Warren. In its finding, the court computed the speed that would result over a ten-minute period of time over a distance of nine miles, and that the speed was 54 miles per hour. Based on this computation, the court found that the automobile Klevgaard was in was not speeding. However, assuming that the estimation as to time and distance was correct, that speed would only be the average speed. A finding of average speed does not negate other speeds. For the average speed to have any probative value it would have to be assumed that the speed did not vary up or down, or if it did vary, the length of time it varied would have to be taken into account. The evidence rules out such assumption.

6. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1967).

to the Bronze Hut Cafe. The officers investigated the Bronze Hut Cafe. The resulting investigation established that the cafe had been forcibly entered by breaking a window in the rear door. Several candy bars and hamburger patties were strewn about on the floor and both refrigerator doors were open. Additionally, there was blood on the refrigerator doors and the floor, as well as the rear entrance.

At the cafe, Warren took blood samples as well as pictures and other physical evidence. During this investigation Klevgaard and Mike were still in the back seat of separate squad cars which were parked near the cafe.

After the investigation, Klevgaard and Mike were transported to the Cass County jail in Fargo in separate squad cars. Klevgaard was a passenger in the squad car driven by Warren, and during this ride several inculpatory statements were made by Klevgaard concerning his involvement in the burglary of the Bronze Hut Cafe. At the Cass County jail Klevgaard was informed for the first time that he was under arrest for burglary.

Prior to trial in district court, Klevgaard moved to suppress "all physical evidence seized by the law enforcement officials on or about June 11, 1980 ... near Hunter, North Dakota, and ... all confessions or statements made by the defendant on or about June 11, 1980." The district court, after a hearing on the motion, entered an order suppressing all such physical evidence and confessions or statements because it found that the warrantless arrest of Klevgaard was made without probable cause and all the evidence seized and state-

ments made were tainted by the illegal arrest. The State appealed from that order.[7]

The first issue for our consideration is whether or not the "physical evidence" seized from and "statements or confessions" made by Klevgaard were in violation of his fourth amendment[8] rights. Several interrelated questions must be considered to resolve this issue. The initial question is whether or not Warren had reasonable cause to arrest Klevgaard.

The trial court doubted the credibility of Warren's testimony regarding the contents of the cardboard box and where the candy bars were found. Footnotes 3 and 4 explain the problem involved.

█ In this instance both the arrest of Klevgaard and the subsequent seizure of evidence were done without warrant. Any search and seizure made without a valid search warrant is unreasonable unless it falls within one of the exceptions to the constitutional requirement that a search be made only upon a valid search warrant supported by probable cause. *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *State v. Matthews*, 216 N.W.2d 90 (N.D.1974).

█ One of the exceptions to the requirement of a search warrant is that a warrantless search may be made incident to a lawful arrest. *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *State v. Harris*, 286 N.W.2d 468 (N.D.1979); *State v. Arntz*, 286 N.W.2d 478 (N.D.1979).

█ An arrest made without a warrant must be based upon reasonable cause.

7. On 28 Nov. 1980, prior to filing the notice for this appeal, the State brought a motion before the district court to vacate its order suppressing the evidence on the basis of the errors in the preliminary hearing transcript. See n.4. However, 28 Nov. 1980 was also the last day for the State to file a notice of appeal to this Court, and the State also filed a notice of appeal on that date. Consequently, no action was taken on the motion to vacate because the district court was without jurisdiction. *Hermes v. Markham*, 78 N.D. 268, 49 N.W.2d 238 (1951).

8. The Fourth Amendment provides as follows:
   "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

*State v. Arntz, supra;* § 29–06–15, NDCC.[9] However, an arrest may not be made upon mere suspicion. *State v. Gagnon,* 207 N.W.2d 260 (N.D.1973).

■ Reasonable cause exists when the facts and circumstances within a law enforcement officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a man of reasonable caution in believing that an offense has been or is being committed. *State v. Phelps,* 286 N.W.2d 472 (N.D.1979); *State v. Page,* 277 N.W.2d 112 (N.D.1979). Reasonable cause must exist at the time of the arrest. *State v. Arntz, supra; State v. Harris, supra.*

■ In determining whether or not reasonable grounds for an arrest exist, the total atmosphere and factual setting must be considered, and even though no single item by itself may establish reasonable cause, if the totality of the circumstances establish reasonable cause, the arrest is valid. *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *State v. Arntz, supra.*

■ To establish probable cause it is not necessary that the officer possess knowledge and facts sufficient to establish guilt; all that is necessary is knowledge that would furnish a prudent man with reasonable grounds for believing a violation has occurred. *Brinegar v. United States, supra.*

In *Brinegar, supra,* the United States Supreme Court made the following pertinent statement concerning probable cause:

"In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly corelative to what must be proved.

. . . . .

"These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." 69 S.Ct. at 1310–11.

■ A violation of the constitutional rights guaranteed by the fourth amendment is enforceable by excluding from trial the evidence searched for and seized in violation of that amendment. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The court-made prophylactic exclusionary rule was first announced by the United States Supreme Court in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and was extended to state courts in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The rationale of the Court in adopting the rule generally had two enunciated purposes: (1) to deter unlawful police conduct and preserve personal privacy and dignity by preventing unwarranted intrusions, (2) to preserve judicial integrity by not permitting evidence tainted with illegality to be admitted in court. *Mapp v. Ohio, supra.*

However, a substantial number of legal scholars and writers are questioning or doubting that the court-made exclusionary rule is accomplishing its stated purposes or objectives, or is worth the societal cost.

---

**9.** The term "reasonable cause" as used in § 29–06–15, NDCC, is synonymous with the more widely used term "probable cause." See *State v. Frye,* 245 N.W.2d 878 (N.D.1976).

*Stone, Warden v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); and *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976). See also, Judicature, Vol. 62, No. 2, page 67, and Judicature Vol. 62, No. 5, page 214 (debates on the exclusionary rule between Judge Malcolm Wilkey, United States Court of Appeals, in opposition to the rule, and Yale Kamisar, Professor of Law, University of Michigan). *State v. Johnson,* 301 N.W.2d 625, 627 (N.D.1981). Nevertheless, we must follow the rule of law established by the United States Supreme Court and made applicable to the states.

▮ Although we are obligated to adhere to the exclusionary rule, mechanical application of the rule is not contemplated. See *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). Its doctrine is no more absolute than the rights guaranteed by the first amendment to the United States constitution and just as those rights need to be, and are, balanced with other constitutional rights of individuals and society, so must the exclusionary rule be balanced and applied with the other rights of individuals and society.

With these standards and observations in mind, we will examine the facts and circumstances leading up to Klevgaard's arrest.

▮ In support of his position that his arrest was not based upon reasonable cause, Klevgaard points out that Warren did not have positive information that a burglary had been committed; that Warren did not see anything prior to the arrest regarding the physical attributes of the Bronze Hut Cafe which would alert him to a burglary situation; that there was no report of a burglary or theft in Hunter that evening; and that possession of candy bars is not in and of itself evidence of a crime. These factors all establish that at the time of the arrest Warren did not positively know that the specific crime of burglary had been committed. However, we do not believe the constitution requires such certainty or specificity in making a warrantless arrest based upon reasonable cause.

*United States ex rel. Fraiser v. Henderson,* 464 F.2d 260 (2d Cir. 1972); *Bates v. United States,* 327 A.2d 542 (D.C.C.A.1974); see also, ALI, Model Code of Pre-Arraignment Procedure, § 120.1(2) at 13, 292–97.

At the time of Klevgaard's arrest, the following facts and information were known by Warren: (1) a lone automobile with out-of-state license plates was parked in front of a cafe in a rural community at 2:40 a. m. and two males were at the rear of the automobile; (2) Klevgaard, one of the males, smelled of alcoholic beverages and used profane and obnoxious language in response to innocuous questions by Warren; (3) Klevgaard had blood on his shirt and arm from a cut on his wrist; (4) Mike stated that they were having trouble with the tail lights, but the tail lights were working when the subjects left the area almost immediately thereafter; (5) there was a cardboard box underneath the rear of the automobile at the time of Warren's initial confrontation with the subjects; (6) the two men put the cardboard box in their car before they left; (7) there were candy bars on the "curve" *next to where the automobile had been parked*; and (8) Warren followed the automobile in his squad car for approximately 10 miles, and, in order to maintain a constant distance between the vehicles, he had to at times travel between 70 and 100 miles per hour.

We have carefully analyzed the manner in which Officer Warren conducted the investigation prior to the arrest and find no evidence of flagrant or excessive conduct on his part. In fact, given the factual circumstances, we believe Officer Warren's handling of the situation to be nothing short of commendable police work. With perfect hindsight the situation may have been handled differently to establish with 100% certainty that the crime of burglary had been committed, but we must recognize that such hindsight is not always available to law enforcement officials as they attempt to ferret out criminal activity. This is especially true when, as in this case, the law enforcement official was alone in a rural community in the early morning hours and

the initial confrontation with one of the subjects reflected a genuine possibility of danger.

█ Warren, having observed the speed and manner in which the defendant's car was driven, had reasonable cause to arrest for reckless driving in violation of § 39–08–03, North Dakota Century Code, a class B misdemeanor. Under ALI, Model Code of Pre-Arraignment Procedure, § 120.1(2), an arrest for reckless driving would have been proper. Unfortunately, we cannot determine from the record on what grounds the initial arrest was made.

The reckless driving was committed in Warren's presence which without a doubt gave him sufficient cause to make the arrest.

█ We are not aware of any rule of law, statutory or otherwise, which prohibits an officer from charging a defendant with a more serious crime [9a] than the one for which he was initially arrested, nor are we aware of any law, and none has been called to our attention, that prohibits an officer from informing the defendant only of the more serious crime for which he was arrested. In this instance, the officer, when the initial arrest was made, did not inform the defendant of the cause for the arrest. If we assume Warren initially arrested Klevgaard for reckless driving and later, when the additional evidence discovered inside the car became available, together with defendant's admissions, Warren became more convinced that Klevgaard committed burglary, it would seem logical that later, at the Cass County jail, when Warren informed Klevgaard of the reason for the arrest, gave burglary as the cause. See *State v. Harris*, 286 N.W.2d 468 (N.D.1979).

We now focus our attention to the interrelated issue whether or not the failure of Warren to inform Klevgaard of the cause of the arrest pursuant to § 29–06–17, NDCC, invalidates the arrest.

Section 29–06–17, NDCC, provides as follows:

"When making an arrest without a warrant, the officer shall inform the person to be arrested of his authority and the cause of the arrest, unless:

1. The person to be arrested then is engaged in the commission of an offense; or

2. Such person is pursued immediately after the commission of an offense or after an escape; or

3. Such person flees or forcibly resists before the officer has opportunity so to inform him; or

4. The giving of such information will imperil the arrest."

The State asserts that subsection (2) would apply if the arrest were for burglary. However, we are not required, nor do we determine if the initial arrest was for burglary or for reckless driving because this is not necessary to determine the legality of the evidence seized in the car, as explained infra.

Regarding the arrest for reckless driving, either subsections (1) or (2), or both, apply, but again we point out that the arrest did not establish the basis for the seizure of the evidence.

█ Although Warren did not follow the subject's automobile with flashing lights or a siren on, we do not believe the statute contemplates such pursuit. We believe the time frame rather than the mode of pursuit is of critical importance in this instance to determine whether or not any subsections are applicable. Accordingly, we conclude that the objectives of § 29–06–17, NDCC, have been met. *Cf. State v. Arntz, supra* [circumstances of arrest by police officer provided sufficient notice of cause of

---

**9a.** The prosecutor before trial may charge the defendant with a more serious or lesser offense than the offense for which the arrest was made whenever the information is reevaluated or new information or evidence is made available. Similarly, the arresting officer should and can add to the reasons for the arrest upon receiving additional information. This would be the equivalent of making another arrest or a "rearrest." If this were not permissible all criminal prosecutions would have to be based upon the first impressions received by the arresting officer, which would produce a ridiculous result.

arrest]; *State v. Iverson*, 187 N.W.2d 1 (N.D.1971), *cert. denied*, 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971) [circumstances of arrest by state's attorney provided sufficient notice of cause of arrest].

Even if Klevgaard were merely taken into custody [9b] we still have to determine whether or not the seizure of the physical evidence from the automobile was permissible. However, before we reach this discussion, we must briefly consider another question.

■ The suppression order provides that "all physical evidence seized by law enforcement officials on or about June 11, 1980, in rural Cass County, North Dakota, near Hunter, North Dakota, is suppressed." It is unclear whether or not the evidence seized from the Bronze Hut Cafe and the "curve" in front of the cafe is included in this order. We do note that Klevgaard's affidavit in support of his motion to suppress the evidence refers only to the evidence which was seized from the automobile. Thus, we believe that the suppression order does not include the evidence seized from the Bronze Hut Cafe and the curb in front of the cafe. However, even if the suppression order did include these items, we believe they would be admissible under the inevitable discovery theory. *State v. Phelps*, 297 N.W.2d 769 (N.D.1980). In this instance Klevgaard's response that it was the back door by which they entered the cafe merely accelerated the investigation and inevitable discovery.

Turning now to the seizure of the evidence in the automobile, we have said that warrantless searches of an automobile are justified when there are exigent circumstances, in addition to probable cause, which require immediate action. *State v. Meadows*, 260 N.W.2d 328 (N.D.1977); see also, *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

In *State v. Meadows, supra* at 330, we also stated that:

"The search of an automobile, with or without a warrant, must be made upon probable cause, based upon a reasonable belief arising out of the circumstances known to the officer, that the automobile contains articles which are subject to seizure. [Citations omitted.]"

In this instance it is arguable that because the car was stuck and both subjects were already under arrest, the "exigent circumstances" requirement was not met. Klevgaard also points out "that there were several law enforcement officers who could have stood guard against the immobilized automobile in order that a search warrant could be obtained."

■ We believe that in this instance there were exigent circumstances so as to make the seizure of the material valid. This occurred late at night on a public road where the car was accessible to the general public. Furthermore, we believe the following comments in *Chambers v. Maroney, supra*, 90 S.Ct. at 1981, are applicable in this instance:

"For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either

**9b.** In *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), a woman was accosted and robbed at gun point by a young man in the women's restroom on the grounds of the Washington Monument. Later, two other women were assaulted and robbed in a similar episode in the same restroom. The defendant was described as a young, black male, 15 to 18 years old, approximately 5′5″ to 5′8″ tall, slender in build, with a very dark complexion and smooth skin. A few days later a police officer observed the defendant in the Washington Monument concession area and approached him. The defendant gave the officer his name and said he was 16 years old. When asked why he was not in school, he replied that he had just walked away from school. The officer then informed him of the likeness to the suspect's description. The defendant was then taken into custody, ostensibly because he was a suspected truant. He was then transported to police headquarters, where the police briefly questioned him, obtained the desired photograph, telephoned his school, and released him. The defendant was never formally charged or arrested with any offense and the detention at the station lasted for about an hour.

course is reasonable under the Fourth Amendment."

■ Be that as it may, in this instance a search in the technical sense did not occur. *State v. Planz*, 304 N.W.2d 74 (N.D.1981). There is no evidence that the officers opened the trunk, looked in the glove compartment, or moved anything in the car so as to be able to observe the material seized. Assuming for purposes of argument only that the arrest was invalid for whatever reason, the seizure nevertheless was lawful because of the circumstances under which the evidence was seized. Significantly, the car was not stopped as a result of the arrest but came to a halt because the driver steered it in a manner so that it became stuck. The officer, or officers, in due course should and would have looked the car over carefully because the motor was still running. Furthermore, the passenger door of the car was open and the evidence was visible from the outside of the car. Even if no arrest had been made, there was a strong possibility that the car would have been carefully and closely examined by Warren and his "backup" assistants and the evidence would have been discovered. As such, the evidence comes under the inevitable discovery concept and rule. *State v. Phelps*, 297 N.W.2d 769 (N.D.1980). The evidence was not obtained as a result or product of the arrest.

Furthermore, we do not believe the stated purpose of the exclusionary rule would be served in this instance if the physical evidence were suppressed. See *Michigan v. Tucker, supra.*

Accordingly, we conclude that the physical evidence was lawfully seized from the automobile.[9c]

The last issue for our consideration relates to the "statements or confessions" made by Klevgaard after he was arrested. The district court suppressed these statements because of the fourth amendment violation. See *Wong Sun v. United States, supra.* However, because we have concluded that there was no fourth amendment violation, we need not address the issue of these statements as they relate to the fourth amendment.[10]

Nevertheless, we must consider whether or not Klevgaard's "statements or confessions" were made in violation of the fifth amendment.[11]

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1967), the United States Supreme Court declared that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444, 86 S.Ct. at 1612. The *Miranda* court then outlined a series of recommended "procedural safeguards"[12] to ap-

---

**9c.** A warrantless seizure of material in a car was upheld because of particular circumstances in *Price v. United States*, D.C.Ct.App., 27 Mar. 1981, 29 Crim.L.Rep. 2089; a similar seizure was upheld in *United States v. Benjamin*, 7 Cir., 1981, 637 F.2d 1297, 29 Crim.L.Rep. 2090.

**10.** See *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

**11.** The fifth amendment to the United States Constitution provides in part as follows:

"No person . . . shall be compelled, in any criminal case, to be a witness against himself . . . ."

**12.** The Supreme Court outlined these "procedural safeguards" as follows:

"Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444, 86 S.Ct. at 1612.

In this instance, the following *Miranda* warning was read to Klevgaard:

"You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. You can decide at any time not to exercise these rights and not answer any questions or make any statements."

prise the defendant of his rights. The Court said that a defendant could waive these rights, but that any waiver must be made "voluntarily, knowingly and intelligently." *Ibid.*

In determining whether or not a waiver is made "voluntarily, knowingly and intelligently," the totality of the circumstances must be considered. *State v. Roquette,* 290 N.W.2d 260 (N.D.1980).

Klevgaard asserts that the totality of the circumstances were overbearing to his will and caused him to involuntarily make the inculpatory statements. In particular, Klevgaard asserts that he was very intoxicated; that he was handcuffed and placed in the back seat of a squad car; that he was separated from the other subject; that he could only talk to the law enforcement officers; that he was in the back seat of a squad car for a considerable period of time while the police officers investigated the Bronze Hut Cafe; and that he had not been informed of the cause of his arrest at this time. (The cause of arrest was given later.)

It is conceded by Klevgaard that the *Miranda* warning was read to him at the time of his arrest. The statements made by Klevgaard on the way from Hunter to the Cass County jail were recorded on tape by Warren and transcribed. The following dialogue from that conversation was read into the record at the suppression hearing:

"A, [Warren] At that time I asked him a question, 'I read to you your Miranda rights, remember?' He states, 'Yeah.' He says, 'I know you did.' I asked him, 'You understand them?' He says, 'Yeah. I remember them when I was laying down in the gravel there.'

"I asked him a question, 'Yeah, you are under arrest, you know.' He states, 'Yeah.' I asked him, 'We are on tape, you know.' He replies, 'Yeah, I knew that.' I say, 'You did, huh?' he says, 'Yeah.'

"I asked him a question, 'So what we say here is on tape, you understand that?' He replies, 'I understand that.'

"Subject states, 'I got nothing to hide because I'm guilty as hell.' I answer, 'Yeah.' He states, 'I wish I wasn't but I committed it.' I state, 'Yeah.' "

The record reflects that Warren detected the odor of alcohol on Klevgaard, but does not indicate whether or not Klevgaard was intoxicated. Furthermore, the record does not indicate that the confession was a result of coercion or police misconduct. Rather, the confession resulted when Klevgaard volunteered statements which were not in response to questions and were made immediately after Klevgaard was reminded that the *Miranda* warnings had been given to him. The factual setting surrounding Klevgaard's statements does not depict a situation in which there was an overbearing of the defendant's will which resulted in involuntary statements. Accordingly, we conclude that under the totality of the circumstances, the statements or confessions were freely and voluntarily made by Klevgaard.

For reasons stated in this opinion, the order of the district court is reversed and the case is remanded for trial.

VANDE WALLE, Acting C. J., and PAULSON and PEDERSON, JJ., concur.

GLASER, District Judge, sitting in place of ERICKSTAD, C. J., disqualified.

GLASER, District Judge, concurring specially.

The trial court's conclusion that probable cause for arrest was lacking at the time of the initial arrest is correct, but it does not automatically follow that the evidence must be suppressed.

One exception to the warrant requirement frequently referred to is the "search incident to a lawful arrest" exception; but such search may extend only to the person of the defendant and to those areas within his easy reach. The purpose is to search for weapons and for evidence of the crime which might otherwise be lost or destroyed by the defendant. See: *Dixon v. State,* 23 Md.App. 19, 327 A.2d 516 (1974). As the defendants were already safely in custody in the police car, a seizure of items from the defendants' vehicle cannot be justified on a

"search incident to arrest" rationale. Further, if probable cause for the arrest was lacking, it obviously means the "search incident" rationale is not an available exception. It also means that any evidence obtained *as a result or product* of the unlawful arrest is inadmissible; but the evidence is admissible if some other exception to the warrant requirement is available to the prosecution or if the evidence was not obtained as a result of the arrest.

When the officer first observed the defendants, the circumstances were such as to authorize temporarily detaining and questioning the defendants. The suspicion existed that criminal activity was afoot. See: *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Arntz*, 286 N.W.2d 478, 479 (1979); 49 N.D.L.Rev. 127; Sec. 29-29-21, N.D.C.C. When he attempted to do so, the response was such that he decided to defer the process until assistance arrived. As it turned out, it was not necessary to stop the vehicle, because it was disabled by the suspects. He did not search the vehicle. He was in a place he had a right to be when he observed the objects in the vehicle. His observation, together with the previous information in his possession, clearly furnished probable cause for believing the cafe had been burglarized and that the defendants had committed the offense. At the time probable cause accrued, there had been no Fourth Amendment intrusion; no search, no seizure.

Both the arrest of the defendants and the seizure of the evidence from the vehicle (because of exigent circumstances) were at that point clearly proper. This is so, even though the initial arrest was arguably lacking probable cause. Although the officer may have prematurely arrested the defendant, doing so did not result in a forfeiture of his right to be present at the scene and observe what there was to be observed. None of the information obtained by the officer up to the time that probable cause had definitely been established was derivatively obtained from the unlawful arrest. It was not the "fruit of the poisonous tree." See: *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), and cases cited therein which illustrate the difference.